Good afternoon. I'm Jim Wilder. I represent Chairman Frankie Johnson, and I'm here to ask you to vacate the summary judgments that were entered in favor of Pneumo Abex, which was just called Abex, in Owens, Illinois, that's referred to as OILA. If this is the case, it sounds like civil conspiracy. Owens, Illinois, at one point in its brief, suggests civil conspiracy actions are a threat to the tort system. Civil conspiracy actions have been recognized in this state for more than 100 years. If we go just to the area of asbestos litigation, the Supreme Court issued the Adcock decision in 1995. It's filed on 164.02.54, which was an action for civil conspiracy. It was one in which the court determined, affirmed the Fourth District, which had held that the complaint stated a claim for civil conspiracy. It came to the Supreme Court in the Fourth District after a trial, but it wasn't a true trial on merits, because Owens Corning had failed to comply with Rule 237 and had been defaulted on liability. But the Adcock court set out the premises of civil conspiracy, which is that conspiracies are rarely susceptible of direct proof. Instead, they are often based on circumstantial evidence coupled with the common-sense knowledge of the behavior of persons. That was repeated by the Supreme Court in the McClure v. Owens Corning decision in 1999, in which the Supreme Court granted judgment O.V. in a case, but set out the same principles. So civil conspiracy isn't a threat to the tort system. It's part of our tort system and has been, and has been affirmed by the Supreme Court as a valid cause of action in asbestos cases twice in the last 22 years. You're going to hear, if you read the briefs, you already know there's a lot of cases cited. They're all Fourth District cases, but a lot of cases cited in the two Supreme Court ones. There's a lot of cases cited by the defense, especially in terms of decisions of the Fourth District. One of the things that all of those decisions have in common, as was true with McClure and Adcock, is they all are decisions after trials, after jury trials. They're all decisions where the court is looking at evidence after the plaintiff has had their day in court to try to prove that there's a conspiracy. None of them say anything about changing the rules on summary judgments. The rules on summary judgments are pretty straightforward, no matter what district you're in or no matter the decisions of the Supreme Court, which is that at the time of summary judgment, all inferences, all reasonable inferences, are drawn in favor of the non-movement. The evidence is construed strictly against the movement, and only in favor of the non-movement. And if there's a genuine issue of material fact, then the jury decides that. Now, in this instance, the trial court granted summary judgment, and with all respect to the trial court, I'm not going to go into the trial court's order much, since your review is de novo, but the trial court, I think, mistakenly did a couple of things. One is, and I'll talk about it in a second, as to ABEX, I think it was the wrong burden that was applied. And in addition, the court accepted, I think, what ABEX said as to what this case was about in terms of what the conspiracy was. ABEX has done a masterful job, and as you probably can tell, we've all been together before in similar circumstances. The attorneys will speak after me. It's not a traveling road show, but we do go from place to place. And we actually get along, which is good anyway. The plaintiff's complaint. ABEX tries to make the plaintiff's complaint for conspiracy against ABEX to be one premise upon experiments at Saranac Laboratory in New York. It was funded by the industry in 1936, ABEX being part of the companies that signed on, along with Johns Manville, to have research, a three-year project, on animal experimentation. It turned out to drag into 12 years before there was a report. And at the end of that 12 years, the report said that some of the animals had gotten tumors, malignancies, and the companies insisted that be removed. There's some suggestion by ABEX in the brief that maybe really it wasn't mandatory that Saranac take it out. Saranac had agreed that the results would be the property of the companies. That was clear back in 1936. They agreed to that in writing. The head attorney for Johns Manville, who was the company, more than 50% market share of most products, and supplied asbestos to its competitors, such as ABEX, a guy named Vannevar Brown, he called a meeting at the corporate boardroom at Johns Manville when they got the report where decisions would have to be made, and wrote to ABEX afterwards, after the meeting, and said it was a unanimous decision of all sponsors that all references to tumors and malignancies would be removed and that they would insist on that. And then they enlisted a doctor from another alleged conspirator to contact the researcher, who said, you know, these things should be taken out, and the researcher agreed that he'd take out what the company thought was essential. So I don't think it was whether or not Saranac was going to do it. Saranac had to do it because it was the right of the companies to censor that. That activity in the McClure case, Supreme Court case, was found to be, was looked on with disfavor, page 151 of the McClure Supreme Court opinion. It was looked upon with disfavor in the Fourth District appellate decisions that came out between 1998 and 2008, five different decisions, in which the Fourth District determined that genuine issues of fact existed, and it was up to the jury to decide whether or not it was a conspiracy. All of that changed in 2011 when a majority decision in the Radamo case said, let us take another look at the evidence, looked at the same evidence that had been in the prior decisions, and said no reasonable juror could ever find there was a conspiracy based on this evidence. Now, ABEX says the case against ABEX is the Saranac lab research. Actually, it's not. If you look at our complaint, the conspiracy alleged is set forth in paragraph 22 of our complaint, and that says that the conspiracy was to suppress information about the harmful effects of asbestos and to fail to tell exposed people of those harmful effects. We also have alleged, and I filed ADCOC. It's the same complaint, basically. Having won once, I wasn't going to change it much. Paragraph 20 said they had knowledge. Paragraph 22 said the conspirators knew if they did warn the customers and employees, the sales were going to go down. And 23 says the conspiracy was to fail to tell exposed people of the harmful effects. Paragraph 24 contained overt acts because a conspiracy has to have an agreement, and it has to have a tort and furtherance of the agreement. It's not actionable if all you did was agree and did nothing. We set forth 15 overt acts. One of them, about the seventh one down, is the editing of Saranac. The first one, though, is that they sold without telling, with knowledge. That's tortious. And so every time one of these companies sold, they committed a tort, and that's enough for the tort requirement of the conspiracy. Not every overt act. Can you restate that? They sold without knowledge. No, if I just said that, then I'm talking too fast and was wrong. Okay, well, I'm not listening. No, it's probably me. I slurred. They had knowledge, and they sold without warning. That's tortious misconduct. And that's what A alleges. And they employed people and exposed them without warning. That's tortious misconduct. And if that's in support of the agreement, that's enough there for the jury to consider. Now, how did they come about this knowledge, and how did they participate in the covering up of this knowledge? Abetz and Mitsit knew about the thirders, and that's Plants Exhibit 299-D. Mitsit didn't tell until the 70s. They said they told in 78. Owens, Illinois, there's documents, which are exhibits, that Owens, Illinois actually helped Owens Corning, who had a problem with their fiberglass insulation in 41. Owens, Illinois supplied articles about asbestos being dangerous to Owens Corning in 41. Owens, Illinois had research done in 43 that told them that their insulation had all the makings of first-class hazard. And, again, the evidence is Owens, Illinois did not tell until sometime in the 70s. All the decisions that the defendants will cite to you, all the cases I've mentioned, all agreed that the companies knew and did not tell. Now, how did they participate? If we go to Abetz, one of the ways that they participated was, again, they didn't tell their own employees. They didn't tell their customers. And in Saranac Lab, the research there, they participated in that, and they participated even in or agreed to the suppression of the information. In Saranac Lab, Burgess, the 4th District in Burgess said- Now, the suppression, that's kind of, I guess, what I was looking at first. Where is the evidence of the agreement of suppression of the information? Because you don't have to have agreement. Right. Correct? You do. But it can be by circumstantial evidence, which is common sense in all inferences in our favor. But if it's purely circumstantial evidence, then you've got to look at something that has to be clear and convincing. If it's got direct evidence, which I say we have as to Abetz, as an example, and which the 4th District in Burgess said we have, then the burden is only more probably true than not true. Okay. Now, what is that direct evidence that you're maintaining? Because obviously you'd rather direct evidence anytime in a conspiracy. Sure. Direct evidence can be contact between the conspirators. Two people speeding up I-39 may not know each other, but if you've got evidence that they stopped at the same time, they talked, they filled up together, they waited and went to McDonald's together and ate and visited, and then sped up again up to I-90, then you've got some direct evidence of them getting along. Those contacts are, in one of the 4th District cases, it's called plus factors. As to Abetz, Abetz is one of the signatories at Saranac. Okay, that's what I'm saying. It's mostly your direct evidence in regard to the research, the findings of the research, and the massaging of the research. Right. That's mainly the direct evidence between Abetz and Johns Manville. It supports the circumstantial evidence that they both knew and neither one told they had additional relationships. Johns Manville supplied asbestos. They had resales of products going on. Now, as to them knowing what was going on, the attorney at Johns Manville wrote a letter when he got the report. He sent a copy of the report to everybody. He wrote a letter, said, Come to the boardroom. Decisions will have to be made. If you can't make it, designate someone. The Abetz medical director did a memo, and Abetz, he was in Chicago. He didn't want to go to New York, and so they sent the memo instead, and the Abetz medical director said, The attorney for Johns Manville can't act for us. He can protect our interests. That medical director said he saw nothing wrong medically with the result that included having the tumors and the lignancies, and in fact you'll see in the briefs there are 80 to 90 decisions already on that point, articles on that point. The medical director realized and said, I think the attorney is concerned about legal repercussions, and he says, Manville, that same attorney can act for us and represent our interests. The 4th District said that's direct evidence. The 4th District said there was other direct evidence in Burgess, such as putting out pamphlets where you don't tell people, returning the report because Abetz's director said, I'd like to keep this and keep it confidential, and the attorney wrote back and said it would be most unwise. We got all the other reports back. So is Saranac a tort or not a tort? There has to be a tort in support of the conspiracy. The tort is they sold and didn't tell. The overt act of Saranac is a plus act or what do you want to call it, reflecting that that selling and not telling wasn't coincidence. Not every overt act has to be tortious, and that's where I think the 4th District went wrong in Rodermo when they reversed five prior decisions. I guess you can't reverse or disagree with five prior decisions by looking at the same evidence. If a group decides they're going to rob every bank in town at noon tomorrow, and they go to Hertz tonight and all rent cars, big SUVs, each of them, and they use them tomorrow, in terms of whether that was part of a scheme or a conspiracy, it's not a tort to go rent a car from Hertz, but it's certainly evidence suggesting it's not an accident that at noon four banks got robbed by people in big SUVs. That's what Abetz wants everything to have to be a tort, and it doesn't. Overt acts, the evidence that can show the failure to tell was not coincidental, not an accident, can be supported by non-overt acts. There has to be a tort somewhere in there, but the easiest tort is overt act A, which is they sold and didn't tell. I have more on Abetz, but... I was just going to say two minutes. Two minutes. OI. OI. 4th District, the only decision by the 4th District that concerns OI in more recent years, concerns OI and what's corny, which we say were a conspiracy. Is it going to be out of decision? It's the most recent one, 2013, it says they're in a conspiracy. 53 to 58, but the 4th District said we think it ended in 58 when Owens-Illinois quit making payload. Owens-Illinois made it, Owens Corning, its related company, sold it and marked it 53 to 58, and they both knew going back to 41, because again, they had a problem with fiberglass. So, 4th District says, but OI withdrew to 58. Jim Johnson was exposed to Owens-Corning payload, and also John's man, Bill Insolation, beginning in 65. The issue as to Owens-Illinois, I submit, is when did the conspiracy end? Gillenrod said 58, but actually we've laid out in our brief, Owens-Illinois still was supplying the packaging in the 60s. Owens-Illinois, with its glass plants, had to have asbestos. Had to have asbestos because of the high heat in the 60s. Owens-Illinois had an interest due to its stock ownership in Owens-Corning, a successful Owens-Corning. Owens-Illinois did not tell until in the 70s its own employees who were being exposed, because it didn't have a glass without the asbestos. So we think the 4th District saying it stopped at 58, simply because OI sold the plant to Owens-Corning, isn't the stop of the interest by Owens-Illinois, and asbestos being secret, as well as the risk, or the concern about future litigation. I've got a lot more, but, and Owens-Illinois says, McClure said we weren't in a conspiracy. McClure did not consider whether Owens-Illinois and Owens-Corning were in a conspiracy. Read the opinion, it says at page 150, that relationship is just tangential, because they were concerned about people that had only been exposed at the UNARCO plant in Bloomington, and the focus was, did they have a relationship with UNARCO. Since my time is probably done, if there's no questions, I'll sit down. Thank you, Mr. Riley. Mr. Simpson, you're going to go first? Yes, Your Honor. May it please the Court, Reagan Simpson for ABEX. ABEX can obviously be sued for its own conduct, but courts across Illinois have held that it cannot be sued in this asbestos litigation for the conduct of others under a conspiracy theory. What they have, what the plaintiffs have, and this is a repetitive set of facts, and the evidence is the same in every case. What they have is parallel conduct that manufacturers didn't warn, and we know from McClure that that is legally insufficient evidence of a conspiracy. You'd have to have more. The only more they have deals with the Saranac study and the decision on whether to publish the 11 mice experiment. And what the courts have held and have granted summary judgments, and the Fourth District has granted judgment in OV, is that the decision not to publish information that has no scientific validity is insignificant as far as conspiracy is concerned. It has no significance whatsoever, and that's really the bedrock of the many, many summary judgments that have been granted across this state in this litigation. In this particular case, the allegation is that ABEX agreed not to publish the 11 mice experiment. Now Judge Reisinger, in his opinion below, just like Judge Drummond in Adams County in another case, felt that there wasn't even evidence of an agreement by ABEX not to publish the 11 mice experiment, because to some extent, as what Mr. Wilder has already said, ABEX acted through its medical director, who saw no problem with publishing this information because it was already published in the United States and abroad. In addition, Dr. Hanlon, the medical director of ABEX, had published a lot of articles about the hazards of asbestos, and they've been widely disseminated to government agencies, to medical schools, as shown in the record. So he had no problem with publication. Now, the other sponsors, when they read Dr. Hanlon's letter that said, I don't see any problem with this, they disagreed, and they communicated to ABEX, and you'll see this is ABEX appendix 198. The reasons why they didn't, they decided not to publish it. Dr. Gardner, the researcher, didn't want it published. Dr. Gardner had used mice that were susceptible to tumors, so you can't even tell whether there's any significance whatsoever to this study. And that's what was communicated to APEX, those valid reasons. And Dr. Pratt, who ended up being one of the authors of the final report of Dr. Gardner's research, because Dr. Gardner had died at that time, he validated the reasons that were communicated to APEX as why this research was not valid. In his courtroom testimony, it was given later on in one of the cases and is part of the record in this case. And that really leads to the second point. So Judge Rasinger said there was no evidence of even an agreement by ABEX not to publish. But the second point is the invalidity of the results of the research. The research was so flawed, Dr. Gardner, who was a researcher, this was one of many, many experiments he did. A lot of this, everything, a lot of stuff was published. But as to this 11-mice experiment, he said it meant absolutely nothing. He said it should be omitted from the report. The leading cancer doctors at the time at the National Cancer Institute looked at this 11-mice study and says it doesn't mean anything. That is in the record. The literature at the time showed that a lot of strains of mice had tumors 90% to 100% after a certain age. So the fact that you had some mice with tumors, even 8 or 9 out of 11, doesn't mean anything. And because the results of this 11-mice experiment... So this wasn't a randomly assigned... There were no control groups. Dr. Gardner was not a cancer researcher. That's also in the record. It's mentioned in this. We have this transcript of the National Cancer Institute. Do you think they hired him then? No. He was one of the foremost researchers of his time, particularly in tuberculosis. Tuberculosis was the big killer at that time, and Serenac was world famous for its research in tuberculosis. He was doing research in asbestosis. That's what this whole thing was about. It wasn't about cancer. Let me just posit a theory. Sure. Is it possible that the jury might decide that Dr. Gardner was selected because he could be directed easily? Well, he was a very world-class, well-known researcher at the time, Justice Wright, and the Serenac lab was famous. It's just that he wasn't someone... The results of his experiments were somewhat unexpected, though. Is that correct? This was an accidental finding. He admits it's an accidental finding. He wasn't trying to research cancer. He didn't have control groups. He didn't know the age of the mice. He didn't know the strain of the mice because he was looking for asbestosis, not looking for cancer. And when he got this result, he knew all the flaws and said it didn't matter. So did the leading doctors at the time. So to quote from Judge Reisinger's opinion, and he was quoting for Redarmo, it's not conspiratorial to hide what has no significance. And so the decision not to publish this research has nothing to do with conspiracy. It's no support for conspiracy. Conspiracy, you have to have an unlawful agreement. There's nothing unlawful about it, and you have to have a tort, and there's nothing tortious about it. Now, if Mr. Wilder says there's direct evidence, no. When they say in their brief, and as Mr. Wilder says, the conspiracy is not serenite, what they're doing is they're relying upon inferences from the decision about the 11 mice experiment to extrapolate a decision not to warn ever about asbestos. They did warn about asbestos later in the 50s or so, but they didn't disclose that C word, that cancer word. And it seems to me that it's very unusual that all these companies would start labeling or warning at the same time and omitting exactly the same information. Well, the record shows they didn't do it at the same time, and that's another thing that's a problem with the conspiracy. They made warnings. These companies did warnings at different times, and they all had their own histories. Everybody followed the lead of Johns Mansfield. Is that correct? No. Who was the first to warn? I don't have those facts in my mind right now, but the evidence in the record shows, and in fact, I believe Dr. Cassin even admitted in the record, which is the plaintiff's expert, that the companies warned at different times and said different things. So there's nothing monolithic about it. I'm relying on the McClure decision that says Johns Mansfield was the first to place a warning label on its products in 1964. In 66, Owens Corning also added the warning labels. So do you think the judges got it wrong in McClure? No, that shows that they're doing it at different times. They're not doing it all together at the same time. And ABETS put on a warning in the 70s. So they're doing different things at different times. But the key point is here, you've got parallel conduct, which is not enough, and you've got the decision not to publish the Eleven Miles Experiment, which has no significance whatsoever. And so that is not enough to create clear and convincing evidence of a conspiracy for purposes of a summary judgment. You have to decide whether a reasonable jury can conclude that this rises to clear and convincing evidence, and it does not under these facts. One minute, please. To fully understand this product, ABETS issued a warning in the 70s, you say? Yes, they issued a warning in the 70s. Are they manufacturing the product, or are they procuring it from Johns Mansfield? No, ABETS bought asbestos from various people, including Johns Mansfield, and then made brakes and brake products, friction products. The standard that is applied here is correct. If you look at the Burgess 1 opinion, at page 865 of that opinion, Justice Cook, who wrote the second opinion for Burgess, is applying the clear and convincing evidence standard. That's because this is clearly a claim based upon circumstantial evidence. Under the clear and convincing evidence standard, there simply is not enough evidence to find that ABETS committed a conspiracy by not publishing something that had no scientific value whatsoever. As a result, the only thing they have is parallel conduct of manufacturers and not warning. Again, ABETS can be sued for its own conduct. The question here is, is there enough evidence for it to be liable for the conduct of other parties and their products that ABETS had nothing to do with? And courts across this state have held that there is insufficient evidence and the court should affirm the summary judgment below. You said that courts across the state are granting summary judgment in favor of the defendants. The published decisions that we're reviewing, which published decision involves summary judgment? There is. All the fourth district opinions deal with jury trials and JODs. We have given to the court opinions from circuit judges who have granted summary judgments and a list of the many summary judgments that have been granted. From the third district? We do not have a reported court of appeals decision in this litigation dealing with the summary judgment. So you're kind of asking us to look at lower court decisions in order to guide our rulings on whether for purposes of summary judgment, the evidence would have been sufficient to survive that motion? Well, these are judges... Normally we don't look down for precedent. These are judges who decided to apply the clear and convincing evidence standard and that looking at the facts presented to them, there was legally insufficient evidence. So obviously this court reviews those decisions. But they decided that the standard applies and they applied the standard and ruled that there was not sufficient evidence. Obviously this court reviews that and makes its own decision. How does summary judgment change the clear and convincing standard? More likely than not clear and convincing? The test always is, and if you look at, for instance, the Ray Bansher case, which is an antitrust conspiracy case, and remember that Illinois has borrowed a lot of its civil conspiracy law from antitrust cases. That's what McClure did primarily. And in that case, what the court said was that necessarily implied that the summary judgment standard is a clear and convincing evidence standard because the question is can a reasonable jury find to a clear and convincing evidence that there is a conspiracy? The concerning conspiracy is not a threat to the court system. The concerning conspiracy is it's too easy to find a conspiracy based on suspicion. So what McClure said is you have to have more than parallel conduct. You have to have clear and convincing evidence. If the conduct is just as likely to be based upon non-conspiratorial reasons as conspiratorial reasons, then it's not sufficient evidence of conspiracy. And that's because the effect of conspiracy is fairly far-reaching to make someone obligated to pay for somebody else's product and conduct. In order to prove your case, though, those decisions don't involve summary judgment. That's true. The reported appellate decisions we have in this litigation have not dealt with summary judgments. If there are no other questions, I'll leave my time. Thank you, Mr. Simpson and Mr. Fisher. May it please the Court. Good afternoon. My name is Matt Fisher. I represent Owens, Illinois. We're here on an appeal of a judgment entered by a trial court because the plaintiffs did not offer sufficient evidence to create a jury question on the important and necessary element of agreement to a civil conspiracy cause of action. Despite a full appeal and now oral argument in this court, plaintiffs do not direct this court to the evidence showing either the creation or existence of an agreement involving Owens, Illinois, to suppress or misrepresent hazards of asbestos. Plaintiffs do not point to any facts that show agreement or lead to a reasonable inference of agreement. Instead, with regard to Owens, Illinois, we have characterizations, accusations, and innuendo about which two things should be said. First, they are not supported by a fair reading of the record. A review of the material cited demonstrates the plaintiff's interpretation of the evidence as either incorrect or lacking a citation. Second, most importantly, they are not facts from which inferences can be drawn. They are characterizations about people's motives from a long time ago. They are suspicions about what might have occurred back in the minds of the people who were acting back in the 1940s, 50s. When the same facts support different conclusions, isn't that a question of fact to go to a jury? If facts support different inferences, absolutely. The plaintiff is entitled to have the factual evidence reviewed at this stage of the proceeding in a light most favorable to them as the nonmovement, and they're entitled to reasonable inferences from those facts. Reasonable inferences here being defined in part by the clear and convincing standard and its corollary, the innocent construction rule. With regard to the summary judgment standard that applies, it is the same standard that applies in a case that's governed by the preponderance of the evidence. The trial court, and now this court on de novo review, is charged with determining whether or not an issue of fact exists for the fact finder to determine. Reed v. Northwestern Publishing is an Illinois Supreme Court decision in the libel context. It says that substantive standard applies to motion practice. Fooden v. Board of Governors indicates that the standard that would apply at directed verdict and de novo is essentially the same procedural standard that the court should apply at the summary judgment stage. So when McClure applies the innocent construction rule and the clear and convincing standard at de novo in a case based on essentially the same evidence that was presented before you here, they are essentially doing the same analysis that this court is now charged to do. Look at all the evidence in the light most favorable to the non-moving. At the de novo stage, that's the party that a verdict was returned against. In McClure, that was my client, Owens, Illinois. The McClure Supreme Court looked at all that evidence in the light most favorable to the non-moving, to Mr. Wilder's clients. They provided all the reasonable inferences that could be drawn from that evidence, and yet they concluded that no reasonable jury could return a verdict for the plaintiff. They did not remand that case. They reversed the jury's judgment, entered judgment for Owens, Illinois, and Owens, 25 or less, the other alleged co-conspirator in that case. It is essentially the same process that applies now, even though we are pretrial at the summary judgment stage rather than post-trial at J&OV. As both Mr. Wilder and Mr. Simpson have indicated, we all know what the evidence is, and if we wait, Plaintiff's argument is essentially it's too soon to apply the innocent construction rule. It's too soon to apply clear and convincing. We could have a trial like many, many trials have been had in the Fourth District. We could go to J&OV, and then the court is obliged to enter a J&OV. Assuming you lose. Well, and I haven't. The trial results have gone both ways. Every verdict returned in favor of the plaintiff, though, has not survived the post-trial review. So you're suggesting that we should view this ruling on summary judgment in the light of, you know, if it's going to be a waste of time to go to trial. I think, Your Honor, that that is part of the reason why summary judgment exists. If there is not going to be anything for a fact finder to decide because the result is preordained, because there is no legitimate issue for the fact finder to decide, then it is the court's obligation to enter a summary judgment and save the judicial resources and the juror time. If I were to summarize what you just said, and maybe that's not correct, every verdict in favor of a jury trial, in favor of the plaintiff, has been overturned on J&OV? The conspiracy verdicts have not survived appellate review. Sometimes they've been overturned on J&OV. Sometimes they've been overturned on appeal. They have not all been overturned for a failure to provide sufficient evidence. So, for example, Burgess 1 is sent back for retrial in light of McClure. In Burgess 2, one of the defendants gets judgment as a result of the direct appeal. ABEX was sent back for a retrial as a result of evidentiary issues that caused the 4th District to then send the case back. So with regard to ABEX, there was in Burgess 2 a decision that said there is sufficient evidence, but the verdict does not survive and we send it back for retrial. Then, in Rodarmal, as Mr. Wilder said, the 4th District said we now are going to say that Burgess 2 and Dukes 1, we disagree with those decisions, and since the Rodarmal decision in 2011, all of the conspiracy rulings have been J&OV or summary judgment for the defendants. One minute, please. With regard to Owens, Illinois, Owens, Illinois is alleged to have conspired here with Owens Corning. The evidence that you heard about Saranac Lab and the Johns Manville lawyer and the ABEX medical director, Owens, Illinois is not involved in any of that. It's an entirely distinct set of evidence. So what we have is plaintiffs now alleging two separate conspiracies that don't overlap. With regard to Owens, Illinois, the McClure court went through painstakingly each of the pieces of plaintiff's evidence and described why they would not support conspiracy liability. There are a handful of pieces of new evidence that Mr. Wilder points to that arose since McClure. They are, however, post-1999 discovery about events that happened 30 and 40 years earlier. They do not support the notion of an intentional agreement. They are, again, unilateral conduct of Owens, Illinois. Owens, Illinois was out of this business in 1958. Sold the cable business to Owens, Corning, Fiery Glass in 58. That's before important medical developments in the 1960s. And it's true, Owens, Illinois had not won. But there's absolutely zero evidence that Owens, Illinois ever even communicated with another company about whether or not to warn, let alone agreed with some other company not to warn. Unless there are any other questions, I would simply ask that the court affirm the judgment in favor of Owens, Illinois. Thank you. Mr. Wilder, any rebuttal? I'll be real quick. OI and OC, their relationship was not considered by the Supreme Court in McClure. Again, the three plaintiffs involved were UNARCA workers, and so the court looked at OI with UNARCA, OC with UNARCA. The Supreme Court says on page 150, the OIOC relationship is tangential in the words of Justice McMorrill to this. So it didn't consider it. As far as there being a few pieces of paper, even Judge Risinger admitted there's more evidence now that was gathered after the 99 decision against OI than there was before in terms of the exhibits that are before you. But OIOC, the only time the reviewing court has considered it is Gillenwater that said, well, they're clearly in a conspiracy 53 to 58. But we think it ended at 58 because OI lost its ability to stop the assembly line. Gardner, he said it meant nothing, omitted from the report. He said it was more significant, and he wanted to omit it from the report because he wanted to do a study for two to three years in length because it was of more significance. Why did they hire Gardner? It says right in the exhibits you've got they hired him because they wanted a report that would stand up in court with the claims that were already coming. That's why they hired him, to fight the claims for asbestosis that were already coming. The fourth district said no scientific validity. Pratt validated that. Dr. Pratt, 50 years later, was a retained expert for ABEX at the time, and on cross-examination, I got him to admit he had nothing to do with the excising of the material from the report. He was a young pathologist who had went there because they thought he had TB. Fortunately for him, he did it, and he stayed there, got on staff. He did the initial draft, and Vorwald, the director then, was the one who took it out, the insistence of the companies. Even if it had no scientific validity, Dr. Frank, who we've disclosed, says, and who's testified, says either way, whether it was or wasn't malignancy, it did have scientific validity because it would have shown new growth. Now, my time is going to run out on me, but in their briefs in here today, many, many cases around the state, they say, have granted summary judgment. In fact, one of them says in their brief, 74 decisions. Between 1995 with ADCOC until Redarmo came out in July of 2011, I never lost a summary judgment anywhere in the state on conspiracy, and it was a lot more than 74 during those, what, 16 years that were brought up, summary judgments, and they were all denied. But you may have lost in a trial on the merits, and would you speak to having us decide whether it's a waste of time for you to take the case? That's the thing, because courts say you've got to, even under their view, you have to determine whether one inference is as consistent as another, as consistent with guilt as with innocence. You have to decide if Dr. Frank is believable, whose, I won't go into his qualifications, as to whether, you know, it doesn't matter if it was or wasn't scientific validity. They took it out for the wrong reason, and they took it out to reflect. They knew what was going on, which is they weren't going to tell. That's why the fourth issue came with Dr. Sobel. The short answer is no, it's not your role with all respect, Judge, to decide whether or not, you know, oh, it would be a waste of time, waste of money, which is sort of what Mr. Fisher was suggesting. In terms of, before I forget, warnings, JM warned in 64, warned in 68 on his products, OC warned in 66, none of those warnings said anything about asbestosis, cancer, mesothelioma. They say all three omit the diseases. Right. It might be harmful to your health and doesn't say how. Skin, going to cause skin warps or what, you know. But there's prior publications with regard to K, low, if I'm saying it correctly, that they put out it was non-toxic. Right, those are the ads, the ads by OC. And that was after the Sander X study. Right, Sander X study, the ads by OI and then OC. So in his 74 summary judgments post-Ridarmo, when Ridarmo abandons the five appellate decisions before it, and Justice Cook did say there was direct evidence, that's in Burgess 1 and Burgess 2, he says that there's much more evidence, there clearly was evidence here other than evidence of parallel conduct, which was sufficient to establish the existence of an agreement between ABEX and John's Mass, John's Manifield to suppress. That's Burgess 2 and 903. As far as why they took it out, Ridarmo, paragraph 124, it is an eminently reasonable inference that they took it out to save their own skin, not because they were worried about scientific validity, because it would affect sales if the one study funded by the industry started talking about tumors, because there was still a dispute back in 48 as to whether it could cause cancer. Courts across Illinois, many, many decisions. No reasonable juror could ever find for the plaintiff, would be what you have to decide. I was thinking as I drove up here, I may be off by one, but between Van Winkle, the first conspiracy case that was tried after Adcock in 96, up till Ridarmo, there had been 15 trials on the plaintiffs and 113 of them. That's 156 people that were persuaded there was a conspiracy. There had been five appellate court decisions out of the Fourth District involving eight different justices. It's a jury question. Then a majority decision by two justices in July of 2011 says, let us take another look at the evidence. That's a quote. They looked at the same evidence that they'd just come out in in 2008 in Dukes, and they said it had to be sent back because of two exhibits. We've done the trial. They were just one? No. Dukes. Dukes versus Drake 8425, the last third. Dukes got sent back just because of two exhibits. They said these were unfair appendix. Goes back for a second trial. The two judges in Ridarmo, the two judges, it was a majority decision, they say, let us take another look at the evidence, and they say what we said in Dukes makes no sense. And what we said in Burgess, the way we get around that, we say is Saranac wasn't scientifically valid, even though we agree they took it out for the wrong reason, to try to save their own skin. The problem with that was whether it was a tort or not tort, it shows, but it's more, you know, that's plus testimony, if you will, in the circumstantial evidence. So the eight justices who said there was a Supreme Court or said there was a genuine issue of material fact, actually one of them, one of them is the author who in 2011 said what I concurred with in 2008 makes no sense. But there's eight justices over a course of nine years and five decisions that said it's a jury question. There's 13 out of 15 decisions by juries. I lost two, but 13 of them won. That's 156 jurors. And how two judges can then say in the summer of 2011, no one could ever believe there was conspiracy on these facts, I do not understand. Jurors, everybody's entitled their day in court, and I say there's genuine issues of material fact on this. And there's a lot we haven't mentioned, and I realize we've got a lot in the briefs, but, you know, we'd ask you to vacate and give the plaintiff their day in court because, again, all inferences at this stage are in the plaintiff's favor. That includes inferences even under the Clearing and Convincing Standard. That includes inferences when it comes to whether it's as consistent with guilt as with innocence. The plaintiff gets a call on all of it. And if a lie doesn't want to go to trial, that's a lie's problem. But if there's a genuine issue of fact, they have to. Probably all the time, so. Thank you. Thank you, Mr. Wilder. Thank you all for arriving today. We'll leave this matter under advisement and get back to you later.